UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

JON PAUL KEAN, # 210913,            )
                                    )
           Plaintiff,               )     Case No. 4:05-cv-64
                                    )
v.                                  )     Honorable Joseph G. Scoville
                                    )
JAMES VAN DYKEN, et al.,            )     **MEMORANDUM OPINION**
                                    )
           Defendants.              )
_____)

This is a civil action brought by a *pro se* plaintiff pursuant to 42 U.S.C. § 1983. On June 20, 2005, when he filed his complaint, plaintiff was a state prisoner[1] at the Boyer Road Correctional Facility located in Carson City, Michigan. Plaintiff was awaiting trial in June 2005, on four criminal charges in Kalamazoo County Circuit Court. Plaintiff's complaint named as defendants almost everyone connected with the state-court criminal proceedings: the state court judges, court employees, prosecutors, police officers, defense attorney, the Kalamazoo Public Defender's Office and even Michigan's Attorney Grievance Commission. On July 8, 2005, a Kalamazoo County jury found petitioner not guilty. On screening of the prisoner's complaint as required by the Prison Litigation Reform Act, this court issued a ten-page opinion (docket # 4) and an accompanying order (docket # 5) dismissing for failure to state a claim every claim asserted by plaintiff, with the exception of his claims against Detectives James Van Dyken and Jack Ryan.

---

[1] Plaintiff was released from prison on parole in June of 2006. His complaint did not identify the criminal conviction or convictions forming the basis of his incarceration. Plaintiff is currently a resident of Portage, Michigan. (docket # 97).

Plaintiff's claims against Detectives Van Dyken and Ryan rest on allegations that the detectives had suborned perjury from witness Kenneth Johnson at plaintiff's second preliminary examination.

The parties voluntarily consented to have a United States magistrate judge conduct all further proceedings in this case, including entry of final judgment. (docket # 21). The matter is now before the court on cross-motions for summary judgment. For the reasons set forth herein, plaintiff's motion for summary judgment (docket # 63) will be denied, defendants' motion for summary judgment (docket # 59) will be granted, and judgment will be entered in defendants' favor on all plaintiff's claims.

### **Applicable Standards**

When reviewing cross-motions for summary judgment, the court must assess each motion on its own merits. *See Federal Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Group*, 415 F.3d 487, 493 (6th Cir. 2005); *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005). "'[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate.'" *Bowling Irrevocable Trust*, 410 F.3d at 309 (quoting *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 2930 (2005)); *see Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006).

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006); *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006). The standard for determining

whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Swiecicki v. Delgado*, 463 F.3d 489, 492 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006); *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th

Cir. 2006). "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations. Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment. The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

A moving party with the burden of proof (typically the plaintiff) faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000))*; Cockrel*, 270 F.2d at 1056 (same).

Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

**Facts**

The following facts are beyond genuine issue. Detectives James Van Dyken and Jack Ryan are Kalamazoo County employees within the Sheriff's Department. Kalamazoo County experienced a number of home invasions and armed robberies in August and September of 2003. Detective Van Dyken was assigned to be the lead detective on these cases. Detective Ryan assisted Van Dyken in this investigation. Police recovered evidence in the form of a tip of a latex glove at the crime scene at 677 Pingree, Comstock Township. This evidence was forwarded to the Forensic Science Division of the Michigan State Police. The DNA profile obtained from the evidence was placed on the Combined DNA Index System (CODIS) database. (Schultze Aff. ¶¶ 3-4, docket # 60, Ex. 5).

Defendant Van Dyken learned that the sheriff in adjacent Van Buren County had arrested two individuals in connection with Van Buren County home invasions and armed robberies: Charles Peterson and Kenneth Johnson. On October 7, 2003, Van Dyken interviewed Peterson at the Van Buren County jail. During this interview Peterson indicated that Jon Kean and Kenneth Johnson had committed a home invasion in the vicinity of Oakland Drive in Kalamazoo County. Peterson claimed that he did not actually witness this crime.

On February 5, 2004, the CODIS database identified an association between the above-described DNA evidence and convicted offender database sample number MIAA52388

belonging to Jon Kean. On March 18, 2004, Forensic Scientist Joel M. Schultze of the Michigan State Police Laboratory contacted the Kalamazoo County Sheriff's Department by telephone concerning the CODIS results. Mr. Schultze requested that a new biological sample be obtained from plaintiff. In May 2004, the State Police Laboratory received buccal swabs taken from Jon Kean. DNA testing on these samples was not completed until October 23, 2004. "The DNA profile from the evidentiary sample (latex glove fingertip - major donor) matched the DNA profile from the known DNA sample obtained from Jon Kean to within 1 in 10.1 quadrillion probability." (Schultze Aff. ¶¶ 5-8).

On April 8, 2004, Defendant Van Dyken came into possession of a letter that Johnson had written to officials in Oshtemo Township, Kalamazoo County. Johnson's letter indicated that he wanted to speak with police officers regarding armed robberies and home invasions that had occurred in the Kalamazoo County, and Johnson provided some factual details regarding those crimes.

On April 13, 2004, Detective Van Dyken and Detective Ryan traveled to Van Buren County and interviewed Johnson at the Van Buren County jail. Before the interview began the detectives advised Johnson of his *Miranda* rights. No promises or incentives were given. During this lengthy interview, Johnson described numerous crimes he had committed with Charles Peterson and Jon Kean, including detailed accounts of Kean's involvement in crimes at (1) 5900 Whitetail Way, Alamo Township; (2) 667 Pingree, Comstock Township, and (3) 2904 East VW Avenue in Schoolcraft Township. Two days later, on April 15, 2004, Johnson directed the detectives to the crime scenes described during the interview. The Kalamazoo County Prosecutor's Office brought criminal charges against plaintiff.

On May 27, 2004, plaintiff had a preliminary examination in Kalamazoo County District Court before Judge Richard A. Santoni. Assistant Prosecutor David DeBack called Kenneth Johnson as one of the prosecution's witnesses. (5/27/04 Consolidated Preliminary Examinations, docket # 63, Ex. 5; docket # 60, Ex. 4). As Kenneth Johnson was called to the witness stand, he commented, "I don't know what's goin' on." (docket # 63, Ex. 5 at 54). After being placed under oath, Johnson testified that he knew plaintiff and Charles Peterson. (*Id.*). The following exchange occurred, eventually concluding with Kenneth Johnson's invocation of his Fifth Amendment right against self-incrimination:

> Q       How is it that you know these two individuals?
>
> A       Acquainted. We are friends. Well, yeah, friends.
>
> Q       All right. Back in August and September of last year, 2003, were you involved in any type of criminal activity with these men?
>
> A       No.
>
> THE COURT: Before we proceed, uh, in terms of advice of rights?
>
> THE WITNESS: Yeah.
>
> THE COURT: For this individual. Is there any plea agreement that has been reached with him? Or what's our situation?
>
> MR. DEBACK: All right. Let me -- let me inquire into that.
>       Sir, you're here today. Have you reached any kind of agreements to -- to offer your testimony?
>
> THE WITNESS: I dunno. I don't think so.
>
> BY MR. DEBACK:
>
> Q       All right. Well, were you informed by Detective Van Dyken that the statements you made could be, at some point, used against you?

A He said -- no, not against me.

MR. DEBACK: They could not be used against you.  Then, Your Honor, I think you'd better inform him of his rights and we'll see where we go from there.

THE COURT: Okay.

MR. ANDERSON: Your Honor, I -- I thought Mr. Johnson, when asked if involved in any crimes with these two individuals, said no.

THE COURT: I didn't hear that part.  I was trying to deal with the issue -- okay, I don't -- I don't need help from the audience and I don't need help from you two.  Okay?

MR. ANDERSON: I may be mistaken --

THE COURT: I didn't -- I don't mean the attorneys.  I mean you two sitting in the front row.  I don't need help from you two folks.

Yes, sir, Mr. Anderson, go ahead.

MR. ANDERSON: I may be mistaken, but I thought when he was asked, "were you involved in any crimes in September and August" --

THE COURT: Okay.

MR. ANDERSON:  -- "of last year with these two individuals", I think he said no.

THE COURT: Is that -- was that correct?

THE WITNESS: I said no, not that I can recall, no.

MR. DEBACK: Before I explore any further, I believe that you should --

THE COURT: Okay.

MR. DEBACK:  -- inform him of his rights.

THE COURT: I'll advise him of his rights anyway because obviously we may get to it at some point.

Uh, you may be asked additional questions here by the Prosecutor, by either of the attorneys regarding activity that could be deemed criminal in nature.  Uh, you have a right under the

-8-

>    Constitution of this State as well as the Federal Constitution to exercise your right not to testify in a way that will incriminate yourself.
>
>    Do you understand your rights? Yes?
>
>    THE WITNESS: Yes.
>
>    THE COURT: Do you wish to exercise your right not to testify in a matter that will incriminate yourself?
>
>    THE WITNESS: Yes. (inaudible) this is what I'm tryin' to get at, Your Honor, I dunno anybody contacted me or said nothin' to me. All of a sudden I'm being whisked away.
>
>    THE COURT: Okay.
>
>    THE WITNESS: And I (inaudible) it seems like somebody should talk to me.
>
>    THE COURT: Let's see where we go. Go ahead Mr. DeBack, anything else you want to ask him at this point.
>
>    MR. DEBACK: So, sir, before you testify, then, do you want to talk to an attorney regarding --
>    THE WITNESS: Yeah. Somethin'. Somebody.

(5/27/04 Consolidated Preliminary Examinations at 56-58, docket # 60, Ex. 4). Judge Santoni dismissed the charges against plaintiff without prejudice to the prosecutor's ability to refile the charges. (*Id.* at 61).

The Kalamazoo County Prosecutor's Office refiled the charges against plaintiff. (Michael Robie Aff. ¶ 9, docket # 60, Ex. 3). Plaintiff's affidavit indicates that in June 2004, he was in the custody of the Michigan Department of Corrections pursuant to an unspecified criminal conviction or convictions. (Plf. Aff. ¶¶ 5-8, docket # 91). On June 15, 2004, plaintiff was arraigned on four criminal charges. (docket # 63, Ex. 6). The first two charges against plaintiff (armed robbery and felony firearm possession) were based on the home invasion that had occurred in September 6, 2003, at 667 Pingree, Comstock Township, Kalamazoo County, Michigan. The latter

two criminal charges (home invasion), were based on the incidents occurring on September 13, 2003, at 2904 East VW Avenue, Schoolcraft Township, Kalamazoo County, Michigan and on August 26, 2003, at 5900 Whitetail Way, Alamo Township, Kalamazoo County, Michigan. (*Id.* at 3-4).

On June 22, 2004, Assistant Prosecutor Robie met with Kenneth Johnson and discussed the specifics of Mr. Johnson's plea agreement. The prosecutor's office agreed that in exchange for Johnson's truthful testimony at the preliminary examination and trials of Jon Kean and Charles Peterson, the prosecutor's office (1) would not charge Johnson with any crimes he testified to that had occurred in Kalamazoo County, Michigan, (2) would request that the Michigan Department of Corrections move Johnson to a different prison facility for his safety, and (3) would write a letter to the parole board on Johnson's behalf describing Johnson's cooperation in the prosecution of Jon Kean and Charles Peterson. Defendants Van Dyken and Ryan had no involvement in the plea agreement reached between the Kalamazoo County Prosecutor's Office and Kenneth Johnson. (Robie Aff. ¶ 11; Van Dyken Aff. ¶ 20; Ryan Aff. ¶ 11).

On June 30, 2004, plaintiff received a preliminary examination in Kalamazoo County District Court before Judge Paul J. Bridenstine. (6/30/04 Consolidated Preliminary Examination, docket # 60, Ex. 6). Assistant Prosecuting Attorneys Michael E. Robie and David DeBack met with Kenneth Johnson immediately before this hearing. Detective Van Dyken was present during a portion of the meeting. Detective Ryan was not present. During the meeting Assistant Prosecutor Robie reiterated to Mr. Johnson that his testimony had to be truthful and Kenneth Johnson assured Robie that it would be. Robie did not review the specifics of Johnson's anticipated testimony with Johnson, except to confirm that the information appearing in Detective Van Dyken's police report summarizing the April 2004 Van Buren County jail interview had accurately recorded Johnson's

statements and that Mr. Johnson hadn't lied when he made those statements. At no time on June 30, 2004, did Detective Van Dyken request or otherwise encourage Mr. Johnson to testify falsely. To the contrary, Assistant Prosecutor Robie reiterated that Johnson's truthful testimony was required under the plea agreement. (Robie Aff. ¶ 13; Van Dyken Aff. ¶¶ 20, 21). In court before Judge Bridenstine, Assistant Prosecutor Robie had the terms of Johnson's plea agreement stated for the record. (docket # 60, Ex. 9 at 11-12). Robie then questioned Mr. Johnson regarding his May 27th testimony:

> Q   Mr. Johnson, did you testify at a prior preliminary examination on May 27th of this year?
>
> A   Yeah, I was here.
>
> Q   Just briefly?
>
> A   Yeah.
>
> Q   And you were asked that back in August and September of the year 2003, were you involved in any type of criminal activity with the two gentlemen that you see in Court today?
>
> A   Yeah, I was asked that.
>
> Q   And you answered no?
>
> A   Yes.
>
> Q   Why did you answer that?
>
> A   'Cause I didn't know what was going on. I mean, I hadn't talked to nobody, I didn't, I didn't know. I had no idea what was going on.
>
> Q   All right. You hadn't spoken to any of the detectives since you talked to Detective Van Dyken?
>
> A   Yeah, since the county jail.

| | | |
|---|---|---|
| Q | | All right. You didn't talk to any member of the Office of the Prosecuting Attorney? |
| A | | No. |
| Q | | You were simply brought from the corrections facility here to Court and put on the stand to testify? |
| A | | Yeah. |
| Q | | All right. And is that why you made that statement? |
| A | | Yes. |
| Q | | And your testimony that you are going to give further today, is that going to be the truth? |
| A. | | Yeah. |

(6/30/04 Preliminary Examination at 13-14, docket # 60, Ex. 6). Johnson then testified regarding numerous crimes he had participated in with Charles Peterson and Jon Kean. (*Id.* at 16). For example, Johnson testified that the Whitetail Way residence had been pointed out by Jon Kean as an attractive target. It was the home of Kean's former supervisor, and it was believed to contain a safety deposit-type box inside. Kenneth Johnson testified that on the date of this home invasion Jon Kean had stayed in Johnson's car about a block away to avoid detection because the homeowners knew Kean. Johnson described how he and Charles Peterson watched a woman with a small child leave the residence, he and Peterson then went inside and took various items, and later Kean, Johnson, and Peterson split the proceeds from those stolen items. (*Id.* at 53-56). Johnson testified as to the circumstances surrounding his contact of Detective Van Dyken. Kenneth Johnson described how he had personally directed Detective Van Dyken to the locations where each of the crimes had occurred. (*Id.* at 57).

Defense counsel's cross-examination sought to emphasize Johnson's direct examination testimony that Kean had not physically entered the Whitetail Way residence:

BY MR. ANDERSON:

Q    This house you went into on August 26th, you said something about a safety deposit box or some kind of box.

A    Some kind of little metal box; that's all I know.

Q    Some kind of safe? Some kind of safe?

A    It wasn't a safe.

Q    Where was that?

A    Supposedly in some kind of Bill, some Bill, I don't know his name. All I knew it supposedly was the supervisor guy. That's all I know.

Q    And you gave Detective Van Dyken a statement about that incident too.

A    Yes.

Q    Didn't you tell him that Mr. Kean went into the house?

A    No, I told him that they made a mistake on that. I told him he didn't go in. He did not go in.

Q    Who made a mistake? You made a mistake or they did?

A    No, the way they, I guess they wrote everything down because I told him this morning because I told, the first thing I told him is look, this is not right.

Q    To who, Detective Van Dyken?

A    I told that to the Prosecutor and Detective Van Dyken.

Q    The Prosecuting Attorney?

A    No, I told it to Van Dyken, I said it's not right.

Q    What were you looking at when you said it wasn't right.

-13-

> A      I had kept -- I was looking at the police report.
>
> Q      The police report?
>
> A      Yeah.
>
> Q      Anything else in the police report that isn't right.
>
> A      Not that I remember, no.

(6/30/04 Consolidated Preliminary Examinations at 88-89, docket # 83, Ex. 1). At the conclusion of the preliminary examination, Judge Bridenstine discussed at some length the evidence that had been presented on the eight criminal charges against Charles Peterson and the four criminal charges against Jon Kean. Judge Bridenstine found probable cause to bind over Kean for trial on all four criminal charges. (6/30/04 Consolidated Preliminary Examinations at 96-110, docket # 60, Ex. 7).

      Plaintiff filed this lawsuit on June 20, 2005, shortly before his trial began on the criminal charges. On June 30, 2005, Kenneth Johnson testified at Jon Kean's Kalamazoo County Circuit Court trial, but sometime between plaintiff's second preliminary examination and the trial, Johnson had obviously changed his mind about testifying against Kean:

> THE COURT: Thank you, sir.
>
> Mr. DeBack, do you wish to ask the gentleman any questions?
>
> MR. DEBACK: Are you going to cooperate and testify today.
>
> MR. JOHNSON: As a Negro person, it is against the law for me to testify against a white -- against a white man.
>
> MR. DEBACK: Your Honor, I'll let the Court inquire because I think he has pretty much expressed already that he is not going to be testifying and I don't know what else to ask him,

frankly, to find out what he intends to do, other than is he going to cooperate, is he going to testify. He has indicated already in several different manners that no he won't.

(6/30/05 Trial Transcript at 6, docket # 60, Ex. 10). Kenneth Johnson did not offer any trial testimony to the effect that Detectives Van Dyken or Ryan had ever suborned or attempted to suborn perjury from Johnson at or before the plaintiff's second preliminary examination. When asked about his prior testimony, Johnson gave these responses:

Q   Do you recall then testifying back on June 30th of 2004 when the question was asked:

"QUESTION: That was both you and Mr. Kean carried the rifles out?"

"ANSWER: Yeah."

"QUESTION: The money and the jewelry?"

"ANSWER: Yeah."

Down on line 10:

"QUESTION: All right. Mr. Kean helped you carry the stuff out?"

"ANSWER: Yeah."

Then on to line 12, you had a chance to look at this:

"QUESTION: And that was the plan that you had with Mr. Kean when you went there?"

"ANSWER: Yes."

Does that refresh your memory?

A   That does refresh my memory, but I just don't remember answering all of these yes's and if I did I just --

Q   You don't dispute that is the way you testified back on June 30th, is that a fair way to put it?

A Yes.

Q Sir, I am going to ask you a couple of quick questions now about the incident from August 26, 2003 at 5900 White Tail Way in Kalamazoo County, Alamo Township. Do you recall anything independently with that?

A I'd have to see more -- you'll have to give me more. Because the places -- see I'm not familiar with a lot of the areas because I am being honest. I am a black guy and I never really ventured out until a lot of those incidents started happening. I never really been out from my side of town.

* * *

Q . . . Let me ask you -- you just had a chance to read this transcript on page 53.

A Right.

Q And you were asked about why it is that you went there, is that correct?

A Right.

Q Do you recall what your response was?

A I think it was about somebody's friend or somebody's boss or something of that nature.

Q You were asked the question:

"QUESTION: So you went there because defendant Kean knew something about this address?"

"ANSWER: Yes."

"QUESTION: Had he worked for this guy or something?"

"ANSWER: Yes."

Does that refresh your memory?

A I guess if that is what I said.

Q You wouldn't dispute that this is the way you testified back on June 30th, a year ago?

A No, that is what I said back then.

-16-

  Q  But now you don't have any recollection?

  A  Well, I'm not positive about everything.

(6/30/05 Trial Transcript at 57-59, Ex. 11). On July 8, 2005, a jury found plaintiff not guilty, and on Judge William G. Schma entered an order of acquittal. (docket # 63, Ex. 8).

## Discussion

  Plaintiff's complaint, liberally construed, alleges that Detectives James Van Dyken and Jack Ryan suborned perjury from witness Kenneth Johnson before plaintiff's June 30, 2004 preliminary examination in exchange for unspecified "favors" in order to have plaintiff bound over for trial on the four criminal charges. (Complaint ¶ V, docket # 1). This court found that plaintiff's allegations were sufficient to state a colorable claim under the Fourteenth Amendment's Due Process Clause. The Fourteenth Amendment prohibits a knowing and deliberate use by a state of perjured evidence in order to obtain a conviction. *Naupe v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *King v. Trippett*, 192 F.3d 517, 522-23 (6th Cir. 1999); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1999). Although there is a lack of legal authority directly on point, the court assumed for purposes of screening the prisoner's complaint that suborning perjured testimony to secure bindover on criminal charges at the second preliminary examination[2] could offend the constitutional protections guaranteed by the Due Process Clause. The court will again assume, without deciding, that suborning perjury in a preliminary examination could violate due process rights.

---

[2]A preliminary examination is not a constitutional prerequisite to prosecution. *See Gerstein v. Pugh*, 420 U.S. 103, 119, 125 n. 26 (1975)

Defendants are entitled to judgment in their favor as a matter of law because the record is devoid of evidence supporting his allegations that Detective Ryan or Detective Van Dyken suborned perjury from Kenneth Johnson in order to have plaintiff bound over for trial at plaintiff's second preliminary examination. Days before the June 30, 2004 preliminary examination, Kenneth Johnson had negotiated an agreement with the Kalamazoo County Prosecutor's Office whereby in exchange for his truthful testimony against plaintiff and Charles Peterson, Johnson could avoid criminal prosecution for his role in those crimes. On the date of the hearing the assistant prosecutor met with Johnson. Detective Van Dyken was present for a portion of this meeting. Defendant Ryan was not present. At no time during this meeting did Detective Van Dyken request or otherwise encourage Mr. Johnson to testify falsely. To the contrary, Assistant Prosecutor Robie reiterated that Johnson's truthful testimony was required under the plea agreement. Plaintiff Jon Kean was not present. He has no personal knowledge of what occurred. The excerpts from Kenneth Johnson's testimony that plaintiff relies on do not provide any evidence from which a reasonable jury could infer that either defendant promised Johnson "favors" in exchange for Johnson offering false testimony against petitioner.

Plaintiff has presented no testimony, from either Johnson or any other eyewitness, to support a jury finding that defendants induced or encouraged Johnson to lie at the preliminary examination. Plaintiff's only evidence from Johnson is a document that purports to be a letter, dated May 21, 2005, in which Johnson apologized for lying about him. (Plf. Ex. 4). This unauthenticated document is pure hearsay and is therefore inadmissible to prove the truth of the matter asserted. FED. R. EVID. 802. Furthermore, even if the letter were admissible, it would be insufficient to raise a triable issue of fact that Johnson perjured himself at the second preliminary examination. The letter

is vague and does not identify any particular false statement. Moreover, the letter relates only to statements Johnson purportedly made while he was "in the Van Buren County jail." It says absolutely nothing about Johnson's court testimony. Therefore, the record is devoid of evidence that Johnson perjured himself at the second preliminary examination. Nor is there any evidence on the necessary element of inducement. Plaintiff's own motion for summary judgment (docket # 63, ¶ 8), asserts only "upon information and belief" that the detectives threatened and intimidated Johnson to get him to provide false testimony. Unsworn assertions made on the basis of information and belief are insufficient to withstand a motion for summary judgment. *See Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005); *Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998); *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991). Furthermore, the mere fact, standing alone, that Johnson's trial testimony contradicted his preliminary examination testimony could not support a jury finding that Johnson changed his testimony under defendants' direction. Again, Johnson's letter of May 21, even if it were admissible, would not assist him in this regard, as it does not say or imply that Johnson's "lies" were induced by defendants. To the contrary, Johnson attributed his unspecified "untrue statement[s]" to anger against plaintiff for refusing to pay Johnson $1,000.00.

In summary, on this record, no reasonable trier of fact could find either that Johnson's testimony at the preliminary examination was false or that he acted under the direction of defendants. Defendants are entitled to judgment in their favor as a matter of law.

## **Conclusion**

For the foregoing reasons, plaintiff's motion for summary judgment (docket # 63) will be denied, defendants' motion for summary judgment (docket # 59) will be granted, and judgment will be entered in defendants' favor on all of plaintiff's claims.


Dated:  November 9, 2006               /s/  Joseph G. Scoville
                                       United States Magistrate Judge